**Consolidated Appeals Nos. 22-8079 & 23-1122**

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

| | |
|---|---|
| LEISL M. CARPENTER, | |
| *Plaintiff - Appellant,* | |
| v. | |
| THOMAS J. VILSACK, in his official capacity as Secretary of the United States Department of Agriculture; ZACH DUCHENEAUX, in his official capacity as Administrator of the Farm Service Agency, | No. 22-8079 (D.C. No. 2:21-CV-00103-NDF) (D. Wyo.) |
| *Defendants – Appellees.* | |
| SARA M. ROGERS, | |
| *Plaintiff - Appellant,* | |
| v. | |
| THOMAS J. VILSACK, in his official capacity as Secretary of the United States Department of Agriculture; ZACH DUCHENEAUX, in his official capacity as Administrator of the Farm Service Agency, | No. 23-1122 (D.C. No. 1:21-CV-01779-DDD-SKC) (D. Colo.) |
| *Defendants - Appellees.* | |

**PETITION FOR REHEARING EN BANC**

William E. Trachman
James Kerwin
Mountain States Legal Foundation
2596 South Lewis Way
Lakewood, Colorado 80227
Telephone: (303) 292-2021
E-mail: wtrachman@mslegal.org

Braden Boucek
Southeastern Legal Foundation
560 W. Crossville Road, Suite 104
Roswell, Georgia 30075
Telephone: (770) 977-2131
E-mail: bboucek@southeasternlegal.org

*Attorneys for Plaintiffs-Appellants*

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................ i

TABLE OF AUTHORITIES.................................................................. ii

STATEMENT OF BASIS FOR REHEARING EN BANC.................... 1

BACKGROUND ................................................................................ 3

A.     Congress Enacted a Race-Based Federal Benefits Program Under
       Section 1005 of the American Rescue Plan Act. .......................... 3

B.     The Panel Ruled for Appellees, and Carpenter Timely Appeals from
       that Ruling. ................................................................................. 7

REASONS FOR EN BANC REHEARING ......................................... 9

A.     The Panel Holding Conflicts with Supreme Court Precedents
       Regarding the Scope of the "Playing Field" for Equal Protection
       Injuries. ..................................................................................... 9

B.     The Panel Opinion Conflicts with Binding Precedent that the
       Government may not Invoke the Voluntary Mootness Doctrine
       unless it has Unwound its Misconduct. ....................................... 13

C.     The Panel's Decision Raises Issues of Exceptional Importance. . 15

       1.     The Panel's Decision May Make It Nearly Impossible to
              Challenge Race Discrimination Committed by Federal
              Agencies. ............................................................................ 15

       2.     The Panel's Decision Incentivizes the Federal Government
              to Engage in as Much Unconstitutional Conduct as it Possibly
              Can, Before It is Enjoined. ................................................. 17

CONCLUSION ................................................................................... 17

CERTIFICATE OF COMPLIANCE ...................................................... 19

CERTIFICATE OF SERVICE .............................................................. 20

## TABLE OF AUTHORITIES

**<u>Case</u>**                                                                  **<u>Page(s)</u>**

*Adarand Constr., Inc. v. Pena,*
  515 U.S. 200 (1995) ............................................................     11

*American Constitutional Law Found., Inc. v. Meyer,*
  113 F.3d 1245 (10th Cir. 1997)................................................     14

*Bldg. and Const. Dept. v. Rockwell Intern. Corp.,*
  7 F.3d 1487 (10th Cir. 1993)..................................................     13

*Boyd v. United States,*
  2023 WL 3118132 (Fed. Ct. Cl., Apr. 27, 2023) ................................     12

*Buchwald v. Univ. of N.M. Sch. Of,*
  159 F.3d 487 (10th Cir. 1998)................................................     11

*Eng'g Contractors Ass'n of South Fla. Inc. v. Metro. Dade Cty.,*
  122 F.3d 895 (11th Cir. 1997)................................................     11

*Faust v. Vilsack,*
  519 F. Supp. 3d 470 (E.D. Wisc. 2021)................................................     4, 5, 6

*Finstuen v. Crutcher,*
  496 F.3d 1139 (10th Cir. 2007)................................................     14

*Ghailani v. Sessions,*
  859 F.3d 1295 (10th Cir. 2017)................................................     15

*Gratz v. Bollinger,*
  539 U.S. 244 (2003) ............................................................     10

*Huffman v. Western Nuclear, Inc.,*
  486 U.S. 663 (1998) ............................................................     15

*Holman v. Vilsack,*
  2021 WL 2877915 (W.D. Tenn., Jul 8, 2021) ....................................     5

*John and Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.,*
  78 F.4th 622 (4th Cir. 2023) ................................................     11

*Los Angeles Cnty. v. Davis,*
  440 U.S. 625 (1979) ............................................................     14, 15

*Miller v. Vilsack*,
  No. 4:21-cv-0595-O, 2021 WL 11115194 (N.D. Tex., Jul. 1, 2021) ...     6

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*,
  508 U.S. 656 (1993) ...............................................................     10

*Rio Grande Silvery Minnow v. Bureau of Reclamation*,
  601 F.3d 1096 (10th Cir. 2010) ............................................     2, 15

*Students for Fair Admission v. President and Fellows of Harvard Coll.*,
  143 S. Ct. 2141 (2023) ...........................................................     14, 16

*Western Nuclear, Inc. v. Huffman*,
  825 F.2d 1430 (10th Cir. 1987) .............................................     14

*WWC Holding Co., Inc. v. Sopkin*,
  488 F.3d 1262 (10th Cir. 2007) .............................................     14

*Wynn v. Vilsack*,
  545 F. Supp. 3d 1271 (M.D. Fla. 2021)..................................     6

**Statutes**

7 U.S.C. § 2279(a)(5)................................................................     4

**Rules**

Fed. R. App. 35 ........................................................................     1

Fed. R. App. P. 35(b)(1)(A)......................................................     1

Fed. R. App. P. 35(b)(1)(B)......................................................     2

Fed. R. App. P. 35(c) ...............................................................     8

Fed. R. App. P. 40(a)(1) ...........................................................     8

**Other Authorities**

13A Charles A. Wright et al.,
  Federal Practice and Procedure § 3533.1 ............................     13

## STATEMENT OF BASIS FOR REHEARING EN BANC

Leisl Carpenter suffered an equal protection injury when similarly-situated farmers and ranchers received federal benefits under a congressional program for which she was not eligible, solely based on her race. That injury was not alleviated when Congress repealed the underlying federal benefits program, on a going-forward basis only.

But the Panel erred by concluding that Carpenter, a Wyoming resident, did not in fact suffer any equal protection injury at all, because all of the recipients of race-based benefits happened to live in New Mexico. That state was selected by USDA officials based on bureaucratically determined non-statutory factors. Further, the Panel rejected the idea that the voluntary cessation doctrine saves Carpenter's suit, even though the federal government's race-based payments were indisputably never unwound. The Court should thus rehear the case en banc under the standards outlined in Fed. R. App. 35.

*First*, under Fed. R. App. P. 35(b)(1)(A), the Panel's decision conflicts with decisions of the United States Supreme Court, which state that the proper "playing field" to determine whether an equal protection injury has occurred is the scope of the policy enacted. Indeed, an agency's decision to administer a discriminatory benefit based on geography does not change the nature of the racial classification, any more than proceeding in alphabetical order would; the Panel's opinion would

entail that Carpenter would lack standing if USDA had started with people with last names starting with "A" or "B," but didn't get to "C." Notably, the Panel cited no authority for the proposition that bureaucratic decision-making can narrow the "playing field" for an equal protection injury, particularly after the complaint is filed.

In the same vein, the panel's decision conflicts with decisions of both the United States Supreme Court and the Tenth Circuit Court of Appeals, which state that a lawsuit cannot be mooted by the government's voluntary cessation of its challenged misconduct unless "events have completely and *irrevocably eradicated the effects of the alleged violation." E.g.*, *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1115 (10th Cir. 2010) (emphasis added). Here, although the Panel mentioned the two-pronged standard in passing, Panel Op. at 22, it conspicuously failed to address the fact that Appellees could never meet that standard, since they haven't even alleged that USDA successfully unwound the racially discriminatory payments that were made before Section 1005 was enjoined.

*Second*, under Fed. R. App. P. 35(b)(1)(B), this case involves the following questions of exceptional importance:

(1)  May agency officials extinguish a live equal protection lawsuit by adopting additional, supposedly race-neutral, qualifications for federal benefits based solely on non-statutory factors never mentioned by Congress?

Of note, the Panel's opinion provides Executive Branch officials with a roadmap to immunize their racially discriminatory conduct: they may simply add more and more non-statutory criteria to federal benefits programs, in order to distinguish and extinguish lawsuits that have already been filed against their agency.

> (2) May a plaintiff invoke the voluntary cessation doctrine when a federal agency has failed to "unwind" equal protection injuries, after a statute's repeal?

This question is of exceptional importance because the Panel adopted, *sub silentio*, the government's theory that courts may never address equal protection injuries that fully accrued before a statute is repealed. In other words, the Panel's opinion incentivizes agency officials to commit as much unconstitutional conduct as possible before being enjoined, and then merely repeal a statute, in order to trigger the mootness doctrine with respect to earlier race discrimination. But an appellate decision blessing that strategy sets a very dangerous precedent.

## BACKGROUND

A.    **Congress Enacted a Race-Based Federal Benefits Program Under Section 1005 of the American Rescue Plan Act.**

As the Panel's Opinion correctly noted, in March 2021, Congress enacted the American Rescue Plan Act of 2021. Panel Op. at 3. Section 1005 of the law provided up to 120% debt relief for certain loans of each "socially disadvantaged farmer or rancher." *Id.* That term was given the same meaning as it was defined in the Food,

3

Agriculture Conservation, and Trade Act of 1990. *See* 7 U.S.C. § 2279(a)(5) (defining "socially disadvantaged farmer or rancher" and "socially disadvantaged group").

In the United States Department of Agriculture's (USDA) Notice of Funds Availability, USDA specifically identified which races were therefore eligible for 120% debt relief: Blacks or African Americans, Asians, Hispanics or Latinos, American Indians or Alaskan Natives, [and] Native Hawaiians or other Pacific Islanders." *Id.*

Section 1005 constituted one of the most brazen race-based federal benefits programs in modern American history. *See Faust v. Vilsack*, 519 F. Supp. 3d 470, 476 (E.D. Wisc. 2021) ("The obvious response to a government agency that claims it continues to discriminate against farmers because of their race or national origin is to direct it to stop: it is not to direct it to <u>intentionally discriminate</u> against others on the basis of their race and national origin.") (emphasis added). Carpenter, who is Caucasian and was therefore ineligible for Section 1005 debt relief, brought suit on May 24, 2021.

Nevertheless, USDA bureaucrats began implementing Section 1005 in June 2021, by making payments to farmers and ranchers in New Mexico, "in part" based

on four factors that Congress never mentioned, and which were not even included in

USDA's Notice of Funds Availability:

> [New Mexico] was selected based in part on [1] having one of the larger volumes of direct loan borrowers eligible for ARPA and [2] a high level of experienced staff. The eligible accounts were selected based on [3] the borrowers being sole proprietorships rather than entities, and [4] past interactions with FSA that reflected a willingness to be part of a pilot initiative.

[ER 253, ¶28 (Declaration of William Cobb); *see id*. ¶¶29-30 (noting that 5 offers

were mailed and 4 were accepted).]

After USDA began making payments, Section 1005 was halted by a

Temporary Restraining Order on June 10, 2021. *See Faust*, 519 F. Supp. at 475

("Here, Defendants lack a compelling interest for the racial classifications."); *see id*.

at 478 ("Defendants are enjoined from forgiving any loans pursuant to Section 1005

until the Court rules on Plaintiffs' motion for a preliminary injunction."). But

Appellees concede that USDA made at least 4 payments to farmers or ranchers

before the program was halted. Br. for Defendants-Appellees at 6 (acknowledging

that at least four payments, totaling at least $160,218, were issued under Section

1005).[1] At that moment, Carpenter suffered an indisputable injury.

---

[1] Of note, neither Appellees, the District Court, or the Panel have ever described these payments as *de minimis*. *See* Panel Op. at 21. Indeed, there is no such thing as a *de minimis* equal protection injury. *See* App. Opening Br. at 21-23.

Section 1005 was then subject to three preliminary injunctions. *See Holman v. Vilsack*, No. 21-1085-STA-jay, No. 21-1085-STA-JAY, 2021 WL 2877915, *1 (W.D. Tenn., Jul 8, 2021) ("Plaintiff will be irreparably harmed if he is denied his constitutional right to equal protection."); *Wynn v. Vilsack*, 545 F. Supp. 3d 1271 (M.D. Fla. 2021) ("To allow the perpetuation of discrimination in such a manner would undermine the Supreme Court's ultimate goal of eliminating entirely from governmental decisionmaking such irrelevant factors as a human being's race.") (internal quotation marks omitted); *Miller v. Vilsack*, No. 4:21-cv-0595-O, 2021 WL 11115194, *18 (N.D. Tex., Jul. 1, 2021) ("[T]he loan forgiveness program is simultaneously overinclusive and underinclusive: overinclusive in that the program provides debt relief to individuals who may never have experienced discrimination or pandemic-related hardship, and underinclusive in that it fails to provide any relief to those who have suffered such discrimination but do not hold a qualifying FSA loan.").

Rather than continuing to litigate these multiple challenges against Section 1005—all of which were deemed likely to succeed—Congress repealed the program when it enacted the "Inflation Reduction Act" in August 2022. Panel Op. at 5. But it is undisputed that the new statute did not address the payments that were issued before Section 1005 was halted. Thus, the injury that had already occurred was never

remedied. USDA has never sought to unwind those payments, so as to "completely and irrevocably eradicate the effects" of Section 1005. As it stands today, Carpenter remains as unequally treated as she was the day that the discriminatory payments were made. And so Carpenter plainly remains injured, even if the elimination of the program means she will not suffer further injuries.

The government moved to dismiss Carpenter's claim as moot before the District Court. Carpenter opposed. In a footnote in their reply brief, Appellees offhandedly mentioned that Carpenter might also lack standing, because she was not within the playing field of those injured by Section 1005. [E288, n.5] In support of that position, Appellees noted that all recipients of Section 1005 payments were residents of New Mexico, based on Mr. Cobb's declaration, quoted above. The District Court latched onto this argument, noting in its order dismissing the complaint that "Plaintiff was never within that 'so-called' playing field for the simple reason that her property is in Wyoming." [ER296]

## B. __The Panel Ruled for Appellees, and Carpenter Timely Appeals from that Ruling.__

The Panel affirmed the dismissal of Carpenter's lawsuit. In a 3-0 decision, the Panel ruled that (1) the fact that the Section 1005 payments were all made to New Mexico farmers defeated Carpenter's standing; and (2) that the voluntary cessation exception to the mootness doctrine did not apply, because "[t]here is no indication

in the Complaint or any exhibit that Congress intends to re-enact the provisions of §

1005, nor is it plausible Congress would do so given that the emergency that

prompted § 1005 in the first place—the sudden economic devastation caused by the

COVID-19 pandemic—no longer exists." Panel Op. at 24.

Notably, the Panel's Opinion mentioned only in passing the second prong of

the voluntary cessation doctrine: that interim relief or events must have completely

and irrevocably eradicated the effects of the alleged violation. Yet it did not engage

with this essential factor. *Compare* Panel Op. at 22 (citing the second requirement

outlined in *Rio Grande Silvery Minnow*) *with* Panel Op. at 24 (only addressing

whether Congress was likely to re-enact Section 1005).

Respectfully, due to these legal errors, Carpenter hereby timely files this

petition for en banc review of the Panel's October 16, 2023 decision. *See* Fed. R.

App. P. 35(c); Fed. R. App. P. 40(a)(1) (allowing 45 days for filing an en banc

petition if one of the parties is a United States officer or employee sued in an official

capacity).[2]

---

[2] Another Appellant, Sara Rogers, has agreed to be bound by the result in this case. But all briefing, as well as the Panel's decision, has involved Ms. Carpenter, as opposed to Ms. Rogers'. *See* Panel Op., at 6, n.3.

## REASONS FOR EN BANC REHEARING

**A.    The Panel Holding Conflicts with Supreme Court Precedents Regarding the Scope of the "Playing Field" for Equal Protection Injuries.**

Congress enacted a federal benefits program for "socially disadvantaged farmers and ranchers." It then directed USDA to use a race-based definition to carry out its program. USDA consciously adopted the definition that discriminated against Carpenter based on her status as a Caucasian individual. USDA then made payments to other farmers and ranchers based on that definition.

Even fully crediting Mr. Cobb's account of the implementation of Section 1005—which comprises three paragraphs of a 40-paragraph declaration filed in support of an unrelated motion—it is still the case that farmers and ranchers similarly situated to Carpenter, based on the text of a federal statute, obtained federal benefits based on their race. The Panel thus erred by concluding that Carpenter did not suffer an injury simply because agency officials adopted the first of the four purportedly race-neutral criteria described above, when there is no dispute that all four of these criteria were entirely outside the scope of the statute.[3] Panel Op. at 16 ("If Appellees'

---

[3] Note also that the first factor is not itself "race-neutral." New Mexico was chosen because it had a "larger volume" of non-Caucasian farmers and ranchers who were eligible for Section 1005 benefits. The Panel recognized this fact in a footnote, but confusingly dismissed it based on undersigned counsel's unrelated statement at oral argument that Carpenter's claim is not that New Mexico was the wrong state in which to first make discriminatory payments. *See* Panel Op. at 16, n.8.

administration of test payments can be said to have excluded Ms. Carpenter from consideration at all, it was because she lives in Wyoming rather than New Mexico."); *Id*. at 16 ("Even if she were not white, Ms. Carpenter would have been excluded from the test payments.").

In other words, the Panel's decision entails that for Carpenter to have standing now, she would need to meet three non-statutory prerequisites: (1) live in New Mexico; (2) be a sole proprietor; and (3) have past interactions with FSA that reflected a willingness to be part of a pilot initiative. None of these qualifications was ever mentioned by Congress when it enacted Section 1005.

And the Panel cited no legal authority for the proposition that even where the plain text of a statute gives rise to an equal protection violation, the practical implementation of the statute nevertheless defeats standing. Indeed, case law is firmly to the contrary. *See Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla*., 508 U.S. 656, 666 (1993) ("To establish standing, therefore, a party challenging a set-aside program like Jacksonville's need only demonstrate that it is able and ready to bid on contracts and that a discriminatory policy prevents it from doing so on an equal basis.") (emphasis added); *see also Gratz v. Bollinger*, 539 U.S. 244, 262 (2003) (describing the holding of *Northeastern Florida* that a business was not required "to show that one of its members would have received a contract absent the ordinance in order to establish

10

standing."); *Buchwald v. Univ. of N.M. Sch. of Med.*, 159 F.3d 487, 493 (10th Cir. 1998) ("[I]t is clear that defendant's <u>stated policy</u> 'caused' the plaintiff to compete at a disadvantage vis-a-vis long-term residents…") (emphasis added).

The existence of other criteria not contained in a statute or policy that may incidentally exclude a plaintiff who suffers race discrimination is immaterial. *See, e.g., John and Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.*, 78 F.4th 622, 634-35 (4th Cir. 2023) ("[T]he Supreme Court has repeatedly held, in equal protection cases, that being forced to compete in <u>a race-based system</u> is sufficient for Article III standing.") (internal quotation marks omitted) (emphasis added). This is only more true when the surplus, non-statutory factors are malleable, unwritten administrative choices made by bureaucrats about how to implement racially discriminatory benefits.

To be clear, the injury that Carpenter pled in her complaint was the injury of being treated differently based on her race by the text of Section 1005. That is sufficient. *See Adarand Constr., Inc. v. Pena*, 515 U.S. 200, 211 (1995) ("The injury in cases of this kind is that a discriminatory classification prevents the plaintiff from competing on an equal footing.") (internal bracket and quotation marks omitted) (emphasis added); *see also Eng'g Contractors Ass'n of South Fla. Inc. v. Metro. Dade Cty.*, 122 F.3d 895, 906 (11th Cir. 1997) ("When the government loads the

dice that way, the Supreme Court says that <u>anyone in the game</u> has standing to raise a constitutional challenge.") (emphasis added).

The fact that USDA officials opted to start with New Mexico when they began implementing Section 1005 is a non-sequitur. They could just as easily have started with borrowers whose last names started with "A" or "B." But plaintiffs whose names start with "C" should not be deprived of the right to challenge unconstitutional race discrimination in such circumstances.

Notably, living in New Mexico was not one of the textual criteria of Section 1005. *Accord Boyd v. United States*, No. 22-1473C, 2023 WL 3118132, *5 (Fed. Ct. Cl., Apr. 27, 2023) ("In this case, however, no official was conferred with contracting authority by ARPA § 1005."); [ER295 ("Plaintiff took out a real estate loan from the Farm Service Agency (FSA), and she would be eligible for the Section 1005 forgiveness program, and future FSA loans, except for the fact that she is not a member of any of the racial groups that are eligible for loan forgiveness.").] And simply put, Carpenter could never have received payments under Section 1005, regardless of which state she lived in, due to her race. Appellees' own evidence shows that eligibility turned on Carpenter's skin color, and that non-Caucasian borrowers "[*d]o not need to apply. ...*" *See* App. Answer Br. at 6 (citing to SAM.gov, which never once mentions state of residency, and merely noting that: "Payments are limited to those direct and guaranteed FSA loan

borrowers who had debt outstanding as of January 1, 2021, <u>and are a racial or ethnic minority</u>.") (emphasis added).]

In other words, Carpenter possessed a concrete injury under Article III when she filed her complaint on May 24, 2021. Binding Supreme Court case law—and a wealth of appellate precedents—contradicts the Panel's decision that she lost that standing based on the subsequent internal administrative decisions of USDA employees.

**B.    The Panel Opinion Conflicts with Binding Precedent that the Government may not Invoke the Voluntary Mootness Doctrine Unless it has Unwound its Misconduct.**

Even as the Panel recognized, there are two prongs to the voluntary mootness doctrine: (1) first, there must be no reasonable expectation that the alleged violation will recur, <u>and</u> (2) second, interim relief or events must have <u>completely and irrevocably eradicated the effects of the alleged violation</u>. Panel Op. at 22.

Indeed, it is the government's burden to establish that a case is <u>not</u> subject to the voluntary mootness doctrine. *See Bldg. and Const. Dept. v. Rockwell Intern. Corp.*, 7 F.3d 1487, 1491 (10th Cir. 1993) ("[T]the conditions under which a suit will be found constitutionally moot are stringent."); *see also* 13A Charles A. Wright et al., Federal Practice and Procedure § 3533.1 n.22 (3d ed. 2023) ("If a plaintiff begins with standing, a defendant who asserts that voluntary cessation has mooted the action carries a heavy burden to prove mootness, a clear difference from the rule

13

that a plaintiff has the burden to establish standing."). But Appellees (1) have never contended that discriminatory payments made under Section 1005 have actually been eradicated; and (2) the Panel offered no analysis as to how it was applying the second factor.

The Panel decision therefore squarely contradicts established case law requiring that Defendants satisfy <u>both</u> prongs, not merely the first. *See, e.g.*, *Los Angeles Cnty. v. Davis*, 440 U.S. 625, 631 (1979) ("When <u>both</u> conditions are satisfied it may be said that the case is moot because neither party has a legally cognizable interest in the final determination of the underlying questions of fact and law.") (emphasis added); *see also Finstuen v. Crutcher*, 496 F.3d 1139, 1151 (10th Cir. 2007) (rejecting the government's assertion of mootness where a same-sex couple still lacked a birth certificate for their child, such that the second prong was not met); *WWC Holding Co., Inc. v. Sopkin*, 488 F.3d 1262, 1269 n.4 (10th Cir. 2007) (rejecting mootness argument despite a change in policy on a going-forward basis, because the agency expressly declined to make its policy change retroactive); *American Constitutional Law Found., Inc. v. Meyer*, 113 F.3d 1245, *2 (10th Cir. 1997) (Table) (rejecting an argument advancing mootness due to an unresolved "injury caused in the past"); *Western Nuclear, Inc. v. Huffman*, 825 F.2d 1430, 1434 (10th Cir. 1987) (rejecting mootness argument where a new agency rulemaking

process did not address an injury allegedly caused by prior rulemaking), *reversed* on the merits (not mootness) in *Huffman v. Western Nuclear, Inc.*, 486 U.S. 663 (1998).

Similarly, numerous cases have ruled in favor of mootness arguments only after reaching the second prong of the test outlined above. *See Lyons*, 440 U.S. at 633 (the government satisfied the second prong because it "completely cured any discriminatory effects" of its prior policy); *Rio Grande Silvery Minnow*, 601 F.3d at 1120 ("[W]e can identify no lingering effects from the federal agencies' alleged violations of the ESA in connection with the issuance of the 2001 and 2002 biological opinions."); *see also Ghailani v. Sessions*, 859 F.3d 1295, 1302 (10th Cir. 2017) (dismissing case as moot only after concluding "there is no evidence that any of the former SAM restrictions are currently affecting Mr. Ghailani.").

## C.    The Panel's Decision Raises Issues of Exceptional Importance.

### 1.    The Panel's Decision May Make It Nearly Impossible to Challenge Race Discrimination Committed by Federal Agencies.

The Panel held that a plaintiff who challenges race discrimination authorized by a statute loses standing when agency officials make unilateral decisions to add implementation criteria after the plaintiff brings suit. If that outcome holds, it will mean that agency bureaucrats can extinguish any lawsuit challenging a statute by merely adding purportedly race-neutral criteria—unmentioned by the text of the authorizing statute—that exclude the plaintiffs in pending lawsuits. That is the exact

opposite of how courts ought to treat claims of race discrimination. *See Students for Fair Admission v. President and Fellows of Harvard Coll*., 143 S. Ct. 2141, 2191 (2023) (Thomas, J., concurring) ("This judicial skepticism is vital. History has repeatedly shown that purportedly benign discrimination may be pernicious, and discriminators may go to great lengths to hide and perpetuate their unlawful conduct.").

The Panel's holding will also have bizarre outcomes, given that federal agency officials have no inherent authority to act without congressional delegation based on the text of statutes. Clever bureaucrats will evade legal challenges through arbitrary administrative choices, and the government will be able to impermissibly narrow the scope of the Constitution's guarantee of equality. Gamesmanship will be rewarded— by relying on the Panel's opinion to dismiss pending lawsuits after *ad hoc* and informal modifications of unconstitutional programs—based on incidental qualities of existing plaintiffs. In other words, if the Panel is correct, it would entail that the Secretary of Transportation could have mooted *Adarand* itself, merely by adding *post-hoc* administrative limitations on who may obtain bids for government contracts. That cannot be.

2.      **The Panel's Decision Incentivizes the Federal Government to Engage in as Much Unconstitutional Conduct as Possible, Before It is Enjoined.**

Dismissing Carpenter's case as moot rewards Executive Branch officials for swiftly engaging in race discrimination before Section 1005 could be enjoined. Indeed, going forward, the Panel's opinion incentivizes agency officials to commit as much unconstitutional conduct as possible, as quickly as possible, before being enjoined; then, they can simply argue that the mootness doctrine requires all pending lawsuits to be dismissed once the statute is subsequently repealed.

Indeed, the Panel's Opinion has no limiting principle. Appellees could have made 40 payments, or 400 payments, or 4,000 payments to non-Caucasian farmers and ranchers under Section 1005, and yet the Panel's logic would allow them to similarly escape all liability based on the repeal of Section 1005, and the end of the COVID-19 pandemic. It is dangerous to have an appellate decision offering such a robust tool to the government, to use in defense of race discrimination.

## CONCLUSION

The Court should rehear this case en banc because the panel ruling conflicts with binding Supreme Court and Circuit precedents, and because it raises issues of exceptional importance for future equal protection challenges to federal misconduct.

Respectfully submitted,

William E. Trachman
James Kerwin
Mountain States Legal Foundation
2596 South Lewis Way
Lakewood, Colorado 80227
Telephone: (303) 292-2021
E-mail: wtrachman@mslegal.org
*Attorney for Plaintiff-Appellant*

Braden Boucek
Southeastern Legal Foundation
560 W. Crossville Road, Suite 104
Roswell, Georgia 30075
Telephone: (770) 977-2131
E-mail: bboucek@southeasternlegal.org
*Attorney for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify that:

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 3,895 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Times New Roman 14-point font.

Date: November 30, 2023

*/s/ William E. Trachman*
William E. Trachman

## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of November, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit via the appellate CM/ECF system. The parties in this case will be served electronically by that system.

Date: November 30, 2023

*/s/ William E. Trachman*
William E. Trachman